UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| TODD HECKMAN | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Case No.: 1:12cv664 (CCB) |
| | : |
| RYDER TRUCK RENTAL, INC., *et al.* | : |
| | : |
| Defendants. | : |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT MICKEY TRUCK BODIES, INC.'S MOTION TO EXCLUDE
OPINION TESTIMONY OF PLAINTIFF'S EXPERTS,
DENNIS L. MCGARRY THOMAS W. BUTLER, AND STANLEY D. PULZ**

In support of its Motion to Exclude Opinion Testimony of Plaintiff's Experts, Dennis L. McGarry, Thomas W. Butler, and Stanley D. Pulz, Mickey Truck Bodies, Inc. ("Mickey") states as follows:

I.   **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff filed the instant lawsuit against Mickey and co-defendant, Ryder Truck Rental, as a result of an accident that occurred on March 6, 2009.  Plaintiff, Todd Heckman, was injured after being struck by an oncoming vehicle on Sandy Hook Road in Knoxville, Maryland.  At the time of the accident, Plaintiff was working for Wantz Distributors ("Wantz") and was in the process of making a beer delivery at the Sandy Hook Grocery store.  *See* Exhibit 1.  The door on the bay of the beverage trailer that Plaintiff was unloading had become jammed and, in an effort to open the door so that the beer could be unloaded, Plaintiff climbed onto the wheel well of the tire underneath the bay and pulled on the hand strap that was attached to the door.  *See* Exhibit 2,

Tr. 25:8-32:12.[1]  The strap broke, Plaintiff lost his balance, fell backwards into oncoming traffic, and was struck by an oncoming vehicle.  *See* Exhibit 1, ¶19.

Mickey manufactures beverage trailers, including the trailer used by Plaintiff on March 6, 2009 ("the subject trailer").  Mickey sold the subject trailer to Ryder in December 2005, which is over three years before Plaintiff's accident occurred.  *See* Exhibit 4.  Before Mickey delivered the trailer to Ryder in 2005, it tested each of the hand straps that were affixed to the each of the trailer's bay doors (16 total bay doors, 8 on each side) and also ensured that all of the stickers and decals were installed properly on the unit, including the sticker that provides the following information vis-à-vis hand straps:

> ATTENTION: DOOR ROLLERS AND DOOR STRAPS MUST BE CHECKED ON A REGULAR BASIS.  DAMAGED OR FRAYED STRAPS MUST BE REPLACED.

*See* Exhibit 4, Mickey 00026, Exhibit 5, Tr. 37-44, and Exhibits 6-7.  Ryder subsequently leased the subject trailer to Wantz and thereafter, Ryder performed the preventative maintenance on the trailer.  *See* Exhibit 1, ¶8-10.  Once Mickey delivered the subject trailer to Ryder in 2005, it is undisputed that Mickey had no ongoing maintenance or inspection duties related to the subject trailer.

Randy Spigler, a Wantz employee, responded to the scene of the accident shortly after it occurred, and is the only witness who saw where the strap broke.  Mr. Spigler's testimony is undisputed that the hand strap broke into two pieces – a longer portion that was "laying on the ground […] in front of the tractor" and a smaller portion that was still bolted to the inside of the door.  *See* Exhibit 8, Tr. 71:19-72:12.  In fact, the strap broke off at the point where it passed

---

[1] Plaintiff has no recollection of the accident itself and remembers nothing from March 6, 2009.  As a result, Plaintiff's testimony about the incident is entirely reliant on what he was told by Jeremy McAfee, who was Plaintiff's helper on March 6, 2009, and who witnessed the events leading up to the accident and the accident itself *See* Exhibit 3, Deposition of Todd Heckman, Tr. 58:17-59:6; 85:17-96:14.

underneath the bay door, and the other piece of the strap remained bolted, through its grommet, and affixed to the inside of the door. *Id.*, Tr. 81:10-82:18; Exhibit 9, Exhibit 10.[2] Both of these pieces of strap disappeared[3] and, as a result, none of Plaintiff's experts examined, inspected, tested, or otherwise provided any information as to the condition, age, or wear of the strap that broke on March 6, 2009. As such, none of Plaintiff's experts have any relevant or reliable information (other than mere speculation) in support of Plaintiff's claims of a manufacturing or design defect with respect to the strap at issue.

Plaintiff's Complaint presents two products liability claims against Mickey, sounding in negligence and strict liability. In support of these claims, Plaintiff contends that the hand strap that broke on March 6, 2009 was defectively designed, defectively manufactured, and was supplied without adequate warning of the alleged defects and corresponding danger. Specifically, Plaintiff contends "that the hand strap product designed, manufactured, and supplied by Mickey reached Mr. Heckman without substantial change in the condition from which it left Mickey's control." *See* Exhibit 1, ¶54. Plaintiff further alleges that Mickey failed "to adequately test, design, manufacture, and supply the hand strap;" failed "to ensure that it supplied or placed adequate warning(s) on the hand strap and/or the trailer to properly alert an individual of the danger posed by foreseeable use of the hand straps;" failed "to detect and/or adequately correct an unreasonably dangerous condition;" failed "to adequately warn, train, and/or instruct its purchasers and/or interim suppliers to ensure proper maintenance and inspection of the hand straps;" failed "to supply a product which complied with recognized

---

[2] Exhibit 10 is provided to illustrate the manner in which straps are affixed to the beverage trailer's bay doors.
[3] Both pieces of this hand strap (the portion that was laying on the ground in front of the tractor and the smaller portion that was still bolted to the inside of the door) were discarded and/or disappeared after the accident and, as a result, have not been available to any of the parties during this litigation for inspection or for any other purpose, including testing.

3

industry standards, practices, procedures and/or methods;" and failed "to supply its products in accordance with applicable codes, statutes, and/or ordinances." *Id.*, ¶ 72.

Neither Plaintiff nor Plaintiff's experts can prove any of the above allegations relating to a design or manufacturing defect or any alleged inadequacy of warnings concerning the alleged defect. As this motion will demonstrate, Plaintiff's experts' opinions lack the necessary factual underpinnings to prove any of the above allegations relating to a manufacturing, design, or warnings defect and, as a result, their testimony will not assist the trier of fact in determining any of these issues. Accordingly, their opinion testimony should be excluded.

## II.      PLAINTIFF'S EXPERTS' OPINIONS

Plaintiff has identified three experts to testify against Mickey in his case in chief: two materials experts, Dennis L. McGarry and Thomas W. Butler, and a human factors expert, Stanley D. Pulz. Significantly, none of these experts can opine that there was a manufacturing or design defect in the strap that Plaintiff pulled on March 6, 2009, or that there were inadequate warnings on the subject trailer, which are the gravamen of Plaintiff's claims against Mickey. Moreover, none can testify to the age or condition of the hand strap that broke on March 6, 2009, including whether it was the original hand strap that Mickey installed on the trailer over three years earlier. Indeed, absent any evidence of a manufacturing or design defect in the strap, there is no factual basis to opine that the subject trailer had inadequate warnings of any manufacturing or design defect in the strap. Accordingly, because Plaintiff's experts' opinions are not based on the factual record in this case or on any scientifically-based testing or methodology, they are unreliable, will be unhelpful to the trier of fact and, therefore, should be excluded.

### a. Dennis L. McGarry

In February 2010, Plaintiff retained Mr. McGarry "to investigate the failure of a synthetic web strap" and to "render a professional opinion regarding the cause or causes for the strap failure." *See* Exhibit 11. In his report, Mr. McGarry rendered four conclusions against Mickey, including that:

- The subject strap failed while being used in a foreseeable manner;
- The subject strap was likely not manufactured to design specifications;
- The design of the strap had been recently altered such that the strength of the strap had been significantly reduced; and
- The causes of the failure are a combination of design and manufacturing defects and poor maintenance.

*Id.* at 1. Mr. McGarry, however, did not inspect any portion of the hand strap that broke on March 6, 2009 nor did he perform any testing on any hand strap whatsoever prior to issuing his report. In fact, Mr. McGarry inspected a trailer in April 2010 at the request of Plaintiff's counsel, but he inspected the wrong trailer.[4]

During his deposition, Mr. McGarry revealed, for the first time, that he performed some limited testing after he issued his report. He testified that he "simply pulled apart both the Hackney and Mickey straps, new straps" to show the breaking strength on the strap "wherever it breaks." *See* Exhibit 12, Tr. 10:15-11:4.[5] However, Mr. McGarry only tested the tensile strength of these Mickey straps to failure at the grommet. *Id.*, 76:16-83:5. He explained that he then "re-used the straps that he stretched and broke in tests one and two when he performed tests three and four" and that such tests "are scientifically acceptable to him" even though he did not determine whether his methodology and the "re-using" of the already-stretched and broken straps

---

[4] This April 2010 inspection was the only inspection of the trailer that was performed before this lawsuit was filed in 2012. During the inspection, Mr. McGarry inspected a Hackney trailer rather than a Mickey trailer. *See* Exhibit 12, Tr. 23:6-24:10.
[5] In Mr. McGarry's "pull apart" test on the new straps, the Mickey straps broke at the grommet, which is not where the strap broke on March 6, 2009. *See* Exhibit 12, Tr. 11:5-10.

was acceptable in the scientific community. *Id.*, Tr. 86:5-15. In fact, in considering that the strap broke a few inches below the grommet—where the strap passed under the bay door—Mr. McGarry's tests "show that the area where it broke is not a weak area. [The strap] had to be damaged in order to break there, assuming that it broke there." *Id.*, 82:7-83:5. By Mr. McGarry's own admission, such a situation—that the "strap had to be damaged" where it passed under the door "in order to break there"—relies on the subject strap being "worn" or "damaged" [6] but not defective. *Id.*, Tr. 108:20-109:1.

Mr. McGarry testified that he believes that there is "more than one scenario about the incident" with respect to how it occurred and where the strap broke despite the undisputed testimony of Randy Spigler, the Wantz employee who responded to the accident scene shortly after the incident, and who is the only witness who saw where the strap broke. *Id.*, Tr. 46:6-9. Mr. McGarry "did not know if [he could describe] all of the scenarios," but the "scenarios that he can think of" include:

> The subject strap broke in an area near the grommet area. It's not a hundred percent clear to me that it did not simply just pull out at the grommet. So that's a scenario, that it pulled out, the strap pulled apart at the grommet. It's also possible that the strap was wrapped around a cable like the other straps I saw today. In that case, I think there was severe wear at the bottom of the loop, but not completely broken, that the loop could have separated, which would not have resulted in obvious two pieces. […] The strap simply broke approximately 2 inches from the grommet end.

---

[6] On December 3, 2012, Mr. McGarry inspected the subject trailer and the hand straps that were then-attached to the trailer's bay doors. Mr. McGarry noted that he found "numerous improperly installed straps […] [and] worn and abraded and broken straps. *See* Exhibit 12, Tr. 25:12-13. While Mr. McGarry's inspection revealed that many of the straps as of December 3, 2012 exhibited signs of wear, Mr. McGarry testified that "without a microscope, it is difficult [to determine the cause of the damage on straps that he viewed during the December 3, 2012 inspection or] to tell whether it's actually physically cut or it's just been worn to the point that it broke." *Id.*, Tr. 31:10-20. Regardless, Mr. McGarry performed no testing of the tensile strength of the straps in the middle of the strap, *i.e.*, the point at which the strap broke on March 6, 2009. *Id.*, Tr. 82:4-7. Further, Mr. McGarry's testimony confirms that the "damage" that he saw on the straps during the December 3, 2012 inspection, was the result of wear, tear, or damage after the straps were affixed to the trailer and that he has no basis for opining that any defect existed in the straps when they left Mickey's control.

*Id.,* Tr. 46:12-47:11.  Nevertheless, when asked which is the more likely scenario as to where the strap broke on March 6, 2009, Mr. McGarry replied that he needed to "wait until after I do the testing before I select the most likely scenario."  *Id.*, Tr. 47:12-15.  As this testimony demonstrates, Mr. McGarry's opinions and methodology wholly ignores the record in this case and the unequivocal testimony of the only eyewitness that the subject strap broke into two pieces at the point where it passed underneath the bay door.

Critically, Mr. McGarry does not know how much force Plaintiff exerted at the time of the accident and makes no assumption to that effect.  *See* Exhibit 12, Tr. 37:6-11.  Moreover, Mr. McGarry did not try to recreate or calculate the amount of force that Plaintiff could have exerted by standing in the wheel well and pulling on the strap to open the jammed door.  *Id.*, Tr. 99:4-100:18.[7]  Yet the amount of force that the subject strap could withstand and the amount of force that Plaintiff could have applied are critical pieces of information for Mr. McGarry's analysis and opinions in Plaintiff's case against Mickey.  If Mr. McGarry does not know how much force Plaintiff exerted or could have exerted on the hand strap, and, moreover, does not know the age or condition of the hand strap that broke on March 6, 2009, his conclusion that the hand strap was defectively designed or manufactured[8] is based on nothing but speculation.

---

[7] Instead, Mr. McGarry testified that such an opinion would be within the purview of a biomechanics expert and that he will not be addressing this point.  *See* Exhibit 12, Tr. 99:4-13.  Notably, Plaintiff has not designated a biomechanics expert and, absent such an expert, will not be able to present any competent evidence of the amount of force that Plaintiff exerted immediately prior to the strap breaking.

[8] The "manufacturing defect" that Mr. McGarry identifies is based solely on information provided during the deposition of Mickey's corporate representative, Dean Sink, about the design of the hand strap.  Specifically, Mickey's design of the hand straps calls for the straps to be "doubled over" at the grommet end of the strap, *i.e.,* a double-ply construction at the grommet.  *See* Exhibit 5, Tr. 371:20-372:15.  It came to Mickey's attention in 2008 that some of the straps it received from its strap manufacturer/vendor were not of this double-ply construction at the grommet, but rather had a "single-ply" construction at the grommet.  Other than the double-ply construction at the grommet, the construction of these straps is the same.  Despite Plaintiff's position to the contrary, the distinction between a single-ply and a double-ply strap is immaterial and irrelevant to the instant case because the strap at issue in this case *did not break* at the grommet, but rather broke several inches below the grommet, where the strap passed underneath the bay door.  Mr. McGarry even testified that the issue as to whether the strap was a single-ply or a double-ply strap is irrelevant to his opinions in this case.  *See* Exhibit 12, Tr. 97:11-98:2.

7

b.  **Thomas W. Butler**

Plaintiff also identified Thomas W. Butler as a materials expert and requested that he "render opinions regarding the use of the straps and their resistance to wear and breakage." *See* Exhibit 13. In his report, Mr. Butler concludes that "since the strap did break when pulled by [Plaintiff], it is reasonably certain that it was either defectively manufactured and/or sufficiently worn to allow it to break when [Plaintiff] pulled on it." *Id.* at page 14.

Mr. Butler's conclusion in his report that the strap was defectively manufactured, however, is without merit, and is not supported by his own deposition testimony. Indeed, at his deposition, he did not know whether the subject strap was a new strap, whether it was the original strap that Mickey installed on the truck in 2005, or whether it was a single-ply or a double-ply strap. *See* Exhibit 14, Tr. 17:17-18:22. Nevertheless, he testified that, had the strap been new at the time of the accident, and assuming it broke in the middle of the strap, a few inches below the grommet, it would have had a tensile strength of approximately 1800 pounds. *Id.*, Tr. 21:12-19.[9] Further, Mr. Butler testified that he could not identify any defect in the strap that existed at the time Mickey delivered the trailer in December 2005. *Id.*, Tr. 18:14-18. Moreover, Mr. Butler testified, with respect to the design and dimensions of the strap, that a strap "in good condition is not a defective strap." *Id.*, 42:17-43:1. He also admitted that "[he does not] think it was defectively manufactured. [He] thinks [it is] the wear business." *Id.*, Tr. 50:14-51:1. Ultimately, Mr. Butler conceded that he will not be offering any adverse opinions against

---

[9] Mr. Butler did not determine the amount of force that Plaintiff exerted on the strap at the time it broke. Instead, based on the "mechanics […], statistics, and dynamics" that Plaintiff could have been exerting when the strap broke, Mr. Butler estimated that Plaintiff could have exerted between 300-600 pounds of force on the strap, which is well below the 1800-pound tensile strength of a new strap. *See* Exhibit 14, Tr. 43:8-44:1. Indeed, Mr. Butler testified that the strap had to be in a worn condition the day before the accident "because [Plaintiff] could not break a good [strap], one that was in good condition." *See* Exhibit 14, Tr. 59:3-9.

Mickey, and will not be opining that the hand strap that broke on March 6, 2009 was defective in any manner. *Id.*, Tr. 51:2-5.

### c. Stanley D. Pulz

Plaintiff identified Stanley D. Pulz as an expert in human factors engineering, safety, and warnings. Mr. Pulz generated a written report, in which he opines that "there were no nationally recognized warning signs located on the exterior of the door [Plaintiff] was attempting to open, warning of the use of damaged straps to open the side rolling door […]" *See* Exhibit 15.

The entirety of the basis for Mr. Pulz's opinion that Mickey should have put warning labels on each of the bay doors, *i.e.,* to alert users of the possibility that a hand strap could break, causing the user to fall and/or sustain injury, is based on a single line of deposition testimony. In particular, Mr. Pulz relies on the following testimony of Dean Sink, Mickey's corporate designee, to support his opinion that hand straps are "safety hazards" which necessitate Mickey placing a warning sticker on every bay door to alert the end users of the "defect" and the corresponding danger of falling:

> Q: When this June 6, '95 "effective immediately directive" came out, of the "Attention" sticker or decal, it said, "Damaged or frayed straps must be replaced." Why was that a concern?
> A: Well, obviously, we didn't want our customers using frayed and damaged straps.
> Q: Why? Why was that a sufficient enough of a concern to put an Attention sticker on the body of the truck, the trailer itself?
> A: Obviously, it could be a safety hazard, if it was frayed or damaged.
> Q: And what was the safety hazard that you were concerned about?
> A: Well, it's, obviously, if it's frayed or damaged, it's not going to hold up to the rigors of the job required. That's not the way we put it out. When we put it out, it's a brand-new product. It's in excellent shape. We made care that it's – it's in excellent shape […].
> Q: Was one of the safety concerns that if a driver pulls on a frayed strap that it could break and he could fall?
> A: No, not fall.
> Q: Well, what was the safety concern then?
> A: […] Normally, an operator of a vehicle like this is on the ground, both feet on the ground. So it wouldn't be falling. It **could** be a shoulder injury **possibly**, but not falling. […].

Q: The one safety concern that you've been able to identify is a shoulder injury?
A: Yes, sir.

*See* Exhibit 5, Tr. 144:18-146:5; 150:6-8 (emphasis added); Exhibit 7.  Mr. Sink also testified that, other than the instant case, Mickey has never received any complaints or reports of personal injuries associated with the use of these hand straps.  *See* Exhibit 5, Tr. 93:9-11.

The testimony upon which Mr. Pulz relies illustrates Mickey's knowledge that these hand straps are wear parts rather than personal injury/fall hazards and that, over the course of time, with use in the field and exposure to the elements, these hand straps may deteriorate and may need to be replaced in the ordinary course of the trailer's maintenance. [10]  Further, Mr. Pulz ignores the testimony of Wantz's employees, Randy Spigler and Daniel Strong, both of whom unequivocally explained that hand straps are not "safety parts" but rather are viewed as a convenience or as a luxury for drivers.  *See* Exhibit 8, Tr. 43:15-44:17, 173:7-11; Exhibit 17, Tr. 65:20-66:17.  The basis for Mr. Pulz's opinions is likewise not supported by the testimony of Mr. McGarry or Mr. Butler, as neither of Plaintiff's materials experts identifies any defect in the strap.

Mr. Pulz further testified that the classification of a hand strap as a hazard (and subsequent need to warn) "depends on the strength […] and condition of the strap" and that this particular strap "was frayed."  *See* Exhibit 18, Tr. 43:20-44:11.  Mr. Pulz did not know anything about the condition of the subject strap on or before March 6, 2009—or of any other hand strap—but nevertheless opined that the subject strap first became "faulty" when it broke on

---

[10] Greg Fisher, who is the CFO and Vice President of Finance and Operations at Mickey, conservatively estimates that, based on the number of beverage bodies and beverage trailers manufactured by Mickey between 1983 and 2011, there have been more than 6.3 billion bay door openings and closings on beverage bodies and beverage trailers manufactured by Mickey over that period.  *See* Exhibit 16, at page 5-6.  Of those estimated 6.3 billion bay door openings and closings during that 28-year period, there have been no personal injuries associated with strap failures at any point in time other than the incident involving Mr. Heckman.

March 6, 2009.  *Id*., Tr. 41:3-22, 67:4-13.[11]  As a result, it is unclear how Mr. Pulz can reconcile these two positions: on one hand, in his report, he makes the conclusory opinion that the hand straps, by their very nature, from the moment they are placed on a trailer, are a hazard for which a warning must be supplied; while on the other hand, he opines that, only as the straps deteriorate, do they become "faulty" or, presumably, a hazard.

Despite the inconsistencies in Mr. Pulz's testimony, he opines that Mickey had an obligation to place a warning sticker on each rolling door.  *Id.*, Tr. 73:9-77:12.  Again, this opinion is based solely on Mr. Pulz's reliance on Mr. Sink's testimony and Mr. Pulz's misunderstanding of Mr. Sink's explanation of "hazard."  Mr. Pulz did not know whether such an obligation—to place a warning sticker on every bay door—was industry standard or whether any other beverage trailer manufacturer places warning stickers on each bay door, as he proposed.  *Id.*, Tr. 77:19-78:22.  As the entire basis for Mr. Pulz's testimony relies solely on Mr. Sink's deposition and is not based on any independent analysis, industry standard, testing, or consideration of any information concerning the history of the product, Mr. Pulz's conclusions lack a proper factual basis and should be excluded.

### III.  <u>LEGAL STANDARD</u>

The admissibility of expert testimony is governed by Fed. R. Evid. 702 and *Daubert v. Merrill Dow Pharm. Inc.*, 509 U.S. 579 (1993).  Rule 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the tier of fact to understand the evidence or to determine a fact in issue;

---

[11] Mr. Pulz testified that he had "no idea" what the strength of the subject strap was, how long this particular strap was on the trailer, or the condition of the strap at the time of the accident.  *See* Exhibit 18, Tr. 41:3-13.  Mr. Pulz did concede, however, that the straps are in proper condition when they leave the manufacturer's possession.  *Id.*, Tr. 41:18-20.

      (b) the testimony is based on sufficient facts or data;
      (c) the testimony is the product of reliable principles and methods; and
      (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Because expert witnesses have the potential to be both "powerful and quite misleading," Rule 702 and Rule 104(a) require that the court act as a "gatekeeper" and make an initial determination that a proffered expert is qualified and that his testimony is both relevant and reliable. *See Fireman's Fund Ins. Co. v. Tecumseh Products Co.,* 767 F. Supp. 2d 549, 53 (D. Md. 2011); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert*, 509 U.S. at 589). Moreover, given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded. *See United States v. Dorsey*, 45 F.3d 809, 815-16 (4th Cir. 1995). The inquiry to be undertaken by the district court is "a flexible one" focusing on the principles and methodology employed by the expert, not on the conclusions reached. *Daubert*, 509 U.S. at 594-95. While *Daubert* addressed purely scientific testimony, this "gatekeeping" obligation has subsequently been expanded to all expert testimony offered pursuant to Rule 702. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending the application of the *Daubert* factors to also include the testimony of engineers and other non-scientific expert testimony based on technical and other specialized knowledge).

      Federal courts, including this Court, interpret Rule 702 as requiring trial judges to act as gatekeepers, and to admit only expert testimony that satisfies a two-prong test for reliability and relevance. *Daubert*, 509 U.S. at 589-91; *Adams v. NVR Homes, Inc.*, 141 F.Supp.2d 554, 565 (D. Md. 2001). To satisfy the "reliability" prong, the Court must determine whether the proffered expert testimony consists of "scientific knowledge" and is "supported by appropriate validation." *Adams*, 141 F.Supp.2d at 565; *Aldridge v. Goodyear Tire & Rubber Co.*, 34

F.Supp.2d 1010, 1023 (D.Md. 1999) (interpreting Rule 702 to "require[…] some objective, independent validation of the expert's methodology"). Moreover, a court should not "credit an expert witness who 'testifie[s] to no customs of the trade, refer[s] to no literature in the field, and [does] not identify [relevant principles],' but merely [gives] 'his own subjective opinion.'" *Freeman v. Case Corp.*, 118 F.3d 1011, 1016 (4th Cr. 1997) (quoting *Alevromagiros v. Hechinger*, 993 F.2d 417, 421 (4th Cir. 1993)). Second, the Court must further inquire to ascertain whether the proposed testimony is relevant, *i.e.*, whether under Rule 702 it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Dorsey*, 45 F.3d at 813.

In sum, *Daubert, Kumho*, and their progeny require trial courts to act as gatekeepers to the admission of proffered expert testimony. For an expert's testimony to be properly admissible, the subject matter must be appropriate, the expert witness must be qualified, the witness must possess a reasonable probability regarding the opinion, the opinion needs a proper factual basis, and the information used to form that basis of the opinion is the type reasonably relied upon by experts in the field. *See Giddings v. Bristol-Myers Squibb Co.*, 192 F.Supp.2d 421 (D. Md. 2002). In the instant case, Plaintiff's proffered expert testimony from his materials experts, Mr. McGarry and Mr. Butler, and from his human factors expert, Mr. Pulz, are based on extremely limited investigation and analysis and, as such, lack the necessary indicia of reliability and relevance, and do not support the allegations in Plaintiff's Complaint. As a result, the proffered expert testimony does not satisfy *Daubert*. Accordingly, this Court should exclude the opinions of Mr. McGarry, Mr. Butler, and Mr. Pulz, the underlying basis for which fails to satisfy this Court's standards governing the admissibility of expert testimony.

IV. **Plaintiff's experts have not conducted any reliable investigation of the evidence in this matter and, as such, their opinions are based on insufficient facts, unreliable methodology, and their testimony will not help the trier of fact <u>understand the evidence or determine any of the issues in this case.</u>**

Despite the conclusions set forth in Plaintiff's expert witness designation and in the expert reports of Mr. McGarry, Mr. Butler, and Mr. Pulz, it is clear that none of Plaintiff's experts have conducted a reliable investigation of the evidence in this case and, as a result, will be unable to satisfy the standards set forth in Fed. R. Evid. 702 or 703, *Daubert, Kumho*, or any of its progeny. Indeed, none of Plaintiff's experts have examined, inspected, or tested the subject hand strap that broke on March 6, 2009. Moreover, none of Plaintiff's experts have any information with respect to the age or condition of the strap immediately prior to Plaintiff's March 6, 2009 accident, *i.e.,* whether the subject strap was new, in good condition, frayed or worn in any manner, or even whether it was the original strap that Mickey affixed to the trailer when it sold the trailer to Ryder in December 2005. None of Plaintiff's experts know the amount of force that the subject strap could have withstood on March 6, 2009 or the amount of force that Plaintiff applied to the strap on March 6, 2009 as he stood in the wheel well of the trailer's tire.

More importantly, neither of Plaintiff's materials experts will testify that there was a manufacturing or design defect in the hand strap when Mickey sold the trailer to Ryder in 2005 or when Ryder thereafter leased the trailer to Wantz. Instead, the materials experts agree that, in order to break on March 6, 2009, the strap had to be sufficiently worn or frayed, which are maintenance-related issues for which Mickey, the manufacturer, is not responsible. Mr. McGarry even testified that the portion of the strap that passed under the bay door, a few inches below the grommet, *i.e.*, where the strap broke on March 6, 2009, "is not a weak area." *See* Exhibit 12, Tr. 82:7-83:5. Instead, "in order to break there," the subject strap had to be "worn"

14

or "damaged." *Id.*, Tr. 108:20-109:1.  Likewise, Mr. Butler testified that he will not be opining that the hand strap that broke on March 6, 2009 was defective in any manner.  *See* Exhibit 14, Tr. 51:2-5.  Instead, Mr. Butler calculated that a strap in good condition has a tensile strength of approximately 1800 pounds and that the strap had to be "worn" on the date of the accident because the Plaintiff could not have broken a strap that was new or in good condition.  *Id.*, Tr. 21:12-19; 59:3-9.

Neither of Plaintiff's materials experts identifies a manufacturing or design defect in the subject strap.  As a result, the basis for Plaintiff's human factors expert's opinion that Mickey inadequately warned of any manufacturing or design defect is extremely limited and is unsupported by the record or his fellow expert's opinions.  Indeed, if there is no manufacturing or design defect, there is no identifiable hazard and, without a hazard, there is no obligation to provide warnings for a hazard that does not exist.

Nevertheless, for the convenience of its customers, Mickey places a maintenance sticker above the lock handle on every beverage trailer that reads: "ATTENTION: DOOR ROLLERS AND DOOR STRAPS MUST BE CHECKED ON A REGULAR BASIS.  DAMAGED OR FRAYED STRAPS MUST BE REPLACED."  Yet Mr. Pulz contends that this Attention sticker is insufficient because it is not a warning label.  According to Mr. Pulz, the hazard is that a hand strap may break, causing the user to fall and/or sustain injury.  However, like the opinions of Mr. McGarry and Mr. Butler, Mr. Pulz's classification of the hand straps as a "hazard" is dependent on the strength, condition, and maintenance of each strap as it ages.[12]  Mr. Pulz did not testify that all straps, including new straps and straps that are in good condition, are also a hazard.  Absent the opinion that all straps are or should be considered a hazard, there is no basis to

---

[12] Mr. Pulz testified that the subject hand strap was "frayed" and that it did not become "faulty" until it broke on March 6, 2009.  *See* Exhibit 18, Tr. 41:3-22, 43:20-44:11, 67:4-13.

conclude that a warning was required in addition to the maintenance sticker that Mickey provided on the trailer.

Indeed, Plaintiff's experts lack the critical information necessary to underpin any opinion that there was a manufacturing or design defect and, subsequently, that there is any obligation to warn about said manufacturing or design defect. Accordingly, this Court should preclude Plaintiff's experts from testifying at trial because their testimony is neither reliable nor relevant and, as a result, will not be "helpful" as required by Fed. Evid. R. 702.

## V.   CONCLUSION

Based on the foregoing reasons, Mickey Truck Bodies, Inc. respectfully requests that this Court exclude the expert testimony of Plaintiff's designated experts, Dennis L. McGarry, Thomas W. Butler, and Stanley D. Pulz.

MICKEY TRUCK BODIES, INC.
By Counsel

CARR MALONEY P.C.


 /s/
Paul J. Maloney, Esquire
Suzanne E. Derr, Esquire
Carr Maloney P.C.
2000 L Street, NW
Suite 450
Washington, D.C.  20036
(202) 310-5500 (Telephone)
(202) 310-5555 (Facsimile)
pjm@carrmaloney.com
sed@carrmaloney.com